United States District Court
For the Northern District of California

1

2

3

4

5

6                        UNITED STATES DISTRICT COURT

7                        NORTHERN DISTRICT OF CALIFORNIA

8

9

10

11

12   VIA TECHNOLOGIES, INC.,

13              Plaintiff,                    No. C 09-2109 PJH

14        v.                                  **ORDER**

15   SONICBLUE CLAIMS, LLC, et al.,

16              Defendants.
     _____/

17

18        On September 29, 2010, the court heard argument in defendants' motions for

19   summary judgment, and plaintiff and counterdefendant's motion to dismiss the second

20   amended counterclaim.  Plaintiff and counterdefendant VIA Technologies, Inc. ("VIA")

21   appeared by its counsel Douglas Hendricks and Adam Lewis; defendant and

22   counterclaimant SONICBlue Claims, LLC ("SBC") appeared by its counsel William

23   McGrane; and defendants Ferry Claims LLC ("Ferry") and Freefall Claims LLC ("Freefall")

24   appeared by their counsel Duane Geck.

25        Having read the parties' papers and carefully considered their arguments and the

26   relevant legal authority, and good cause appearing, the court hereby GRANTS VIA's

27   motion to dismiss the second amended counterclaim; DENIES SBC's motion for summary

28   judgment; and DENIES Ferry/Freefall's motion for summary judgment.

United States District Court
For the Northern District of California

**BACKGROUND**[1]

SONICBlue, Incorporated ("SONICBlue") and three subsidiaries designed and marketed consumer electronic products.  In January 2001, SONICBlue and VIA (a Taiwanese manufacturer of integrated circuits) formed a joint venture  – S3 Graphics Co., Ltd. ("S3 Graphics") – to operate SONICBlue's graphics chip business.  SONICBlue contributed intellectual property rights, including rights it held under a 1998 patent cross-license with Intel Corporation ("Intel").

A number of disputes arose between VIA and SONICBlue relating to their respective obligations, including a dispute regarding accounting discrepancies and post-closing adjustments.  In the context of settlement proposals in 2002, the parties contemplated that VIA might make a loan to or invest in SBC, in the amount of $15 million.  It appears, however, that the loan was never funded.

In April 2002, SONICBlue raised financing in a private placement issuance of $75 million in senior secured subordinated convertible debentures ("the Senior Notes").  Three institutional bondholders, Portside Growth & Opportunity Fund Ltd., Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd. ("the 2002 Noteholders"), acquired the Senior Notes at a discount, for $62.5 million.  The Senior Notes were governed by an Indenture providing that the Notes were subordinated to all "Senior Indebtedness," which was defined as "[a]ll indebtedness of [SONICBlue] due and owing to VIA Technologies, Inc., in an aggregate principal amount not to exceed $15,000,000 or the equivalent thereof in any other currency or composite currency ('the VIA Indebtedness')."

The law firm of Pillsbury Winthrop Shaw Pittman LLC ("PWSP"), which had served as SONICBlue's counsel since approximately 1989, issued a written opinion to the 2002 Noteholders on April 22, 2002, in connection with the private placement offering for the

---

[1]  Additional details regarding the background of the parties' dispute are set forth in orders issued by the United States Bankruptcy Court.  See In re SONICBlue Inc., 2007 WL 926871 (Bkrtcy, N.D. Cal., March 26, 2007); In re SONICBlue Incorporated, 2007 WL 1321746 (Bkrtcy, N.D. Cal., May 4, 2007); In re SONICBlue Incorporated, 2008 WL 170562 (Bkrtcy, N.D. Cal., Jan. 18, 2008); In re SONICBlue Incorporated, 2008 WL 2875407 (Bkrtcy, N.D. Cal., July 23, 2008); In re SONICBlue, Inc., 422 B.R. 204 (N.D. Cal., Dec. 29, 2009).

1    Senior Notes.  In the opinion letter, PWSP stated, among other things, that the Indenture

2    and related agreements "will each constitute a valid and binding agreement of

3    [SONICBlue], enforceable against [SONICBlue] in accordance with its terms."  The opinion

4    letter included a provision (based on what PWSP later described as a "scrivener's error")

5    that the 2002 Noteholders interpreted as stating that any claims relating to the Indenture

6    would be allowable in a bankruptcy case.  The opinion letter did not mention the provision

7    in the Indenture regarding the VIA Senior Indebtedness (although the provision would have

8    been clear to anyone who read it).

9          On March 21, 2003, SONICBlue and its three subsidiaries filed petitions for

10   reorganization under Chapter 11 ("the SONICBlue bankruptcy case" or "the bankruptcy

11   case"), in the United States Bankruptcy Court for the Northern District of California.[2]

12   SONICBlue retained PWSP as general bankruptcy counsel.  The Official Committee of

13   Unsecured Creditors ("the Committee") retained Levene, Neale, Bender, Rankin & Brill LLP

14   ("LNBRB") as legal counsel.  The Committee membership included the 2002 Noteholders,

15   who held the $75 million in Senior Bonds.  The 2002 Noteholders, who came to constitute a

16   majority of the Committee, had separate counsel.

17         Soon after filing the bankruptcy petition, SONICBlue auctioned off substantially all of

18   its assets.  In June 2003, Intel sought relief from the automatic bankruptcy stay to terminate

19   its patent cross-license with SONICBlue (the "Intel litigation").  The following month, VIA

20   and S3 Graphics filed duplicate proofs of claim in the bankruptcy case, each seeking $35

21   million for the joint venture dispute, and another $70 million in liquidated damages, based

22   on the pre-petition failure of SONICBlue to perform various obligations with respect to S3

23   Graphics.

24         In December 2004, SONICBlue brought an adversary proceeding in the bankruptcy

25   _____

26         [2]  The SONICBlue bankruptcy proceeding comprised Case Nos. 03-51775 through
     03-51778 MM, jointly administered.  In 2007, a judge of this court described the SONICBlue
27   bankruptcy as "purportedly the largest bankruptcy pending in the Northern District of
     California."  In re SONICBlue Inc., 2007 WL 3342662 at *1 (N.D. Cal., Nov. 9, 2007).  As of
28   March 5, 2011, the Bankruptcy Court's docket for In re SONICBlue Incorporated (No. 03-
     51775) included 3896 entries.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  case against VIA and S3 Graphics (the "VIA litigation"), in which SONICBlue objected to

2  the proofs of claim filed by VIA and S3 Graphics, and also sought affirmative relief based

3  on alleged breaches of the joint venture agreement and other agreements between the

4  parties.

5  These ongoing disputes presented a major hurdle to the proposal of a bankruptcy

6  plan.  In light of the size of VIA's and S3 Graphics' claims, SONICBlue deferred proposing

7  a plan, so that it could explore resolution of the claims and Intel's related attempts to

8  terminate the patent cross-license.  For the next three years, VIA, S3 Graphics,

9  SONICBlue, and Intel attempted to resolve their disputes.  Although not parties to those

10 disputes, the 2002 Noteholders also became involved in the process.

11 During this time, VIA was represented by Henry Kavane of Pachulski, Stang, Ziehl &

12 Jones.  Because of PWSP's prior representation of Intel, the SONICBlue Bankruptcy Estate

13 also retained O'Melveny and Meyers, LLP ("O'Melveny"), as special litigation counsel to

14 represent it in the dispute with Intel.

15 Between December 2004 and September 2005, the parties engaged in multiple

16 settlement conferences regarding the VIA and Intel disputes.  VIA proposed a global

17 resolution of the disputes, through a single allowed claim of $42.5 million, with an

18 assignment of SONICBlue's rights against Intel.  PWSP notified O'Melveny, LNBRB, and

19 counsel for the 2002 Noteholders of VIA's settlement overtures, and solicited their input.

20 After further negotiations, it was agreed in September 2005 that counsel would seek

21 authority to settle the VIA litigation for a single allowed claim in the amount of $12.5 million,

22 which VIA and S3 Graphics would allocate between themselves.

23 Counsel for the Committee made the Committee's consent contingent on the

24 approval of counsel for the 2002 Noteholders.  At some point, PWSP advised counsel for

25 the 2002 Noteholders that there was some question as to whether the VIA claim might rank

26 senior in priority to the Noteholders' claim under the 2002 Indenture.  The Noteholders

27 agreed to the $12.5 million amount, but only on the condition that the VIA claim was not for

28 borrowed money or "senior debt."  Counsel then crafted language providing that the $12.5

4

United States District Court

For the Northern District of California

1    million Allowed Claim was "neither senior nor junior to any other general unsecured claim."

2        Attorneys from PWSP and O'Melveny took the position in the settlement

3    negotiations that the VIA Senior Indebtedness was limited to the $15 million loan from VIA

4    to SONICBlue, which had never been consummated, and that the provision in the

5    Indenture stating that the 2002 Senior Notes were subordinated to that Senior

6    Indebtedness had simply been inserted for future "flexibility" in the event that the $15

7    million loan was consummated.  (SBC later argued that this representation was false.)

8        In May 2006, special counsel for SONICBlue circulated a revised draft of the

9    settlement agreement, which included additional language providing that SONICBlue and

10   the claimants agreed that "the Allowed Claim is not, and shall not be treated as, 'Senior

11   Indebtedness' under the terms of [SONICBlue's] Indenture, dated as of April 22, 2002, for

12   the . . . Senior Secured Subordinated Convertible Debentures . . . ."  VIA agreed to this

13   language, and the same language was included in the final settlement agreement.

14       In July 2006, PWSP advised counsel for the 2002 Noteholders that the Noteholders'

15   claims were subject to disallowance on the basis of unamortized original issue discount.  In

16   August 2006, counsel for the 2002 Noteholders contacted a PWSP partner to discuss the

17   Noteholders' claims; and to advise that the Noteholders had relied on the opinion letter that

18   PWSP had issued in April 2002 in connection with the issuance of the debentures, which

19   they had interpreted as assuring that their claims were allowable in a subsequent

20   bankruptcy case.

21       Counsel stated further that the Noteholders would demand that PWSP defend and

22   indemnify them for any losses resulting from SONICBlue's challenge to their claim, and that

23   to the extent that the Noteholders were unable to recover in the bankruptcy case the full

24   principal amount of their debentures, they intended to pursue PWSP for negligent

25   misrepresentation and negligence.  PWSP did not disclose this conflict to the Bankruptcy

26   Court, although it did ultimately turn over control of the dispute concerning the original issue

27   discount to the Committee.

28       The formal settlement agreement ("the VIA Settlement Agreement"), which required

United States District Court
For the Northern District of California

1  a release from Intel, was finalized in September 2006.  In late September 2006, PWSP

2  prepared a motion to approve the compromise and settlement.  Pursuant to a

3  confidentiality agreement, the motion papers were filed under seal on October 10, 2006.

4  The notice sent to creditors summarized the basic terms of the settlement, but did not

5  specify that VIA's claim would not be senior to the claims of the 2002 Noteholders, and also

6  did not mention that the Noteholders had threatened to sue PWSP.  No opposition to the

7  motion was filed.

8        At the October 27, 2006 hearing in the Bankruptcy Court, there was apparently no

9  discussion of the fact that the Indenture for the 2002 Senior Notes had included the VIA

10  Senior Indebtedness provision (although the Indenture was a matter of public record), or

11  that the VIA Settlement Agreement provided that the VIA allowed claim was not senior to

12  any other unsecured creditor claim.  The Bankruptcy Court approved the settlement on

13  October 31, 2006.

14        Meanwhile, starting in 2005, William McGrane, counsel for SBC in the present

15  action, had begun attempting (on behalf of Ferry) to negotiate the purchase some of the

16  creditors' claims in the SonicBlue bankruptcy case, including VIA's claim, which Mr.

17  McGrane believed was senior to the claims of the 2002 Noteholders.  According to

18  documents filed in the bankruptcy case, Ferry attempted to obtain a copy of the sealed VIA

19  Settlement Agreement, but was initially unsuccessful.  Ferry apparently learned from VIA in

20  early 2007 that the settlement agreement contained a provision stating that VIA's claim was

21  not senior to the claims of the 2002 Noteholders.

22        The SONICBlue Bankruptcy Estate and the Committee filed a disclosure statement

23  on December 15, 2006, describing their proposed plan of liquidation.  Through objections to

24  the disclosure statement (allegedly based in part on information passed along by Ferry)

25  and subsequent amendments, the Bankruptcy Court learned of PWSP's conflict of interest

26  that arose out of the 2002 Noteholders' demand for indemnification.  The court also learned

27  that the 2002 Noteholders were the controlling members of the Committee, which the court

28  found raised additional questions regarding the propriety of Committee counsel's pursuit of

United States District Court
For the Northern District of California

1  objections to the Noteholders' claims.  In addition, the objections alluded to disclosure

2  issues surrounding the VIA Settlement Agreement and the question whether VIA had

3  waived its rights to seniority over the Noteholders' claims.

4       SBC, a Delaware limited liability company, was formed in early February 2007.  Its

5  initial members were Ferry and Argo Partners Fund III, LLC ("Argo").  Argo immediately

6  transferred a number of SONICBlue creditor claims to SBC, which then joined previously-

7  filed objections to the disclosure statement.  At some later point, Argo ceased to be a

8  member of SBC.

9       In mid-February 2007, the United States Trustee moved to appoint a Chapter 11

10  Trustee, and to disqualify PWSP for its failure to provide full and complete disclosure of its

11  conflict with the 2002 Noteholders.  SBC joined in the request.  Following a hearing, the

12  Bankruptcy Court issued an order on March 27, 2007, disqualifying PWSP from

13  representing the SONICBlue debtors, and appointing a Chapter 11 Trustee.  Following his

14  appointment on April 17, 2007, the Chapter 11 Trustee began an investigation of the

15  alleged improprieties that had occurred in the case.

16       On April 24, 2007, VIA, S3 Graphics, and SBC reached an agreement regarding the

17  transfer of VIA's bankruptcy claim to SBC.  The Claims Transfer Agreement ("CTA"), dated

18  April 24, 2007, begins with "Recitals" stating, among other things, that the VIA Settlement

19  Agreement approved by the Bankruptcy Court on October 31, 2006, provided that the

20  claimants "shall jointly hold a single, allowed general unsecured claim in [SONICBlue's]

21  Bankruptcy Case, in the amount of $12.5 million . . . ('the Allowed Claim')" and that

22  claimants and debtor "agree that the Allowed Claim is not, and shall not be treated as,

23  'Senior Indebtedness' under the terms of [SONICBlue's] Indenture" for the Senior Bonds."

24  CTA, Recitals, ¶ E (referred to in the CTA as "Underlined Recital E Language").

25       The CTA states further that "[a] dispute has arisen in the Bankruptcy Cases as to the

26  propriety of including the . . . Underlined Recital E Language" and "as to whether any such

27  Allowed Claim is, or is not, 'Senior Indebtedness' under the Indenture[;]" and "as to whether

28  the provisions . . . relating to the relative priority of the Allowed Claim vis-à-vis the claims

United States District Court

For the Northern District of California

1  arising under or relating to the Indenture were adequately disclosed to the Bankruptcy

2  Court and other parties in interest."  CTA, Recitals, ¶ F.

3        In the "Agreement" section, VIA and S3 Graphics ("the Claimants") agreed to

4  transfer two rights (the "Transferred Rights") to SBC – "(a) the Claimants' rights to payment

5  with respect to the Allowed Claim and any related rights the Claimants may have as

6  creditor(s) in the Bankruptcy Cases, and (b) any and all rights the Claimants may have

7  under or relating to the Indenture."  CTA ¶ 1.  Other than the Transferred Rights, the

8  Claimants would retain all other rights and obligations they had under the October 2006

9  VIA Settlement Agreement.  Id.  However, the Claimants agreed that they would allocate all

10 of the Allowed Claim to VIA, and none to S3, prior to the "Closing" (delivery of a letter from

11 VIA to SBC allocating the Allowed Claim to VIA, and filing of a Notice of Intended Action in

12 the Bankruptcy Court by SBC, describing the CTA in detail).  Id. ¶¶ 6, 7.

13       SBC would pay VIA an initial $4 million for the Transferred Rights.  Id. ¶ 2.

14 Thereafter, SBC would retain all consideration recovered on behalf of the Transferred

15 Rights up to $4 million ("the Break Even Amount").  Id. ¶ 3.  Any consideration received by

16 SBC over $4 million would be divided pro rata among SBC and VIA/S3 Graphics, to cover

17 their respective litigation costs, and any remaining consideration (the "Excess Cash") would

18 be divided between SBC (75%) and VIA (25%).  Id. ¶¶ 4(a), 5.

19       The parties agreed that nothing in the CTA should be construed "as limiting SBC's

20 post-Closing rights," and acknowledged that SBC had post-Closing rights to "in SBC's sole

21 and only discretion, obtain a resolution of the Senior Debt Disputes . . . so as to maximize

22 recovery on the Transferred Rights and, as part of such resolution, to obtain an order, or to

23 make a binding agreement, to delete, to nullify, or otherwise modify the language of the

24 Underlined Recital E Language, in whole or in part, for such maximization of recovery

25 purposes."  Id. ¶ 8.

26       The CTA acknowledged that SBC had "adequate information concerning the

27 financial condition of the Debtor and the status of the Bankruptcy Cases to make an

28 informed decision regarding the sale/purchase of the Transferred Rights" and that it had

United States District Court

For the Northern District of California

"independently and without reliance on the Claimants . . . made its own decision to enter into this Agreement[;]" and that SBC understood that VIA and S3 Graphics had a business relationship with SONICBlue, and therefore might have "non-public information about the Allowed Claim and the Debtor that has not been provided to SBC." Id. ¶ 10.  SBC also "assum[ed] the risk that the Allowed Claim, or any portion thereof, might not be 'Senior Indebtedness' under the Indenture." Id.

VIA/S3 Graphics agreed, "[s]ubject to compliance with the terms and conditions of this Agreement," to authorize SBC "solely to act in the Claimants' stead (but not in the Claimants' name) to demand, sue for, compromise, and recover all amounts as now are, or may hereafter become due and payable for or on account of the Transferred Rights." Id. ¶ 13. VIA/S3 Graphics further agreed "to take or cause to be taken such further action to execute, deliver, and file or cause to be executed, delivered, and filed, such further documents and instruments as may be necessary or may be reasonably requested in order to effectuate fully the purposes, terms, and conditions of this Agreement." Id. ¶ 15.

The parties each agreed to "defend, indemnify, and hold the other harmless from all losses, damages, and liabilities, including reasonable attorney's fees and expenses, that result from breach of any of their respective representations, warranties, or covenants or any other obligations set forth" in the CTA. Id. ¶ 16.

The parties consented to the jurisdiction of the Bankruptcy Court and "the state and/or federal courts" in the City of San Francisco, California, "in any action to enforce, interpret, or construe any provision of this Agreement," and agreed that any such action would be brought in those courts only. Id. ¶ 18.

Finally, VIA and S3 Graphics agreed to "waive any objection to the transfer of the Transferred Rights." Id. ¶ 20.

On May 30, 2007, following its acquisition of the Transferred Rights under the CTA, SBC brought an adversary proceeding in the SONICBlue bankruptcy case against the 2002 Noteholders, alleging that the Noteholders had improperly used their position as members of the Creditors' Committee to obtain a waiver of VIA's right to treat the Allowed VIA claim

as "Senior Indebtedness" under the 2002 Indenture; and that the Allowed VIA claim was in fact "Senior Indebtedness" under the 2002 Indenture and was entitled to the benefits afforded "Senior Indebtedness" thereunder.  SBC sought a declaration that (not withstanding the VIA Settlement) the VIA Allowed Claim remained senior to the Senior Notes.

According to SBC, the adversary proceedings involved the question whether SBC could prove that Mr. Kavane had believed what he had been told by counsel for the Bankruptcy Estate about the meaning of the 2002 Indenture, and also involved the question whether SBC could establish reliance, an essential element of a fraud claim.  SBC asserts that in an attempt to obtain evidence of reliance, its counsel John Shaffer and William McGrane arranged a meeting on May 31, 2007 with Mr. Kavane, so that he could review the allegations in the complaint in the adversary proceeding against the 2002 Noteholders.

According to SBC's counsel, Mr. Kavane stated during that meeting that he had read the complaint (which had been filed the previous day) and that the allegations were truthful. Among those allegations, according to SBC, were assertions that counsel for the Bankruptcy Estate had "misrepresented" the seniority rights of the VIA Allowed Claim, and that Mr. Kavane had believed those misrepresentations.  SBC asserted that it assumed that it could rely on Mr. Kavane to stick with this position.

In June 2007, SBC filed a motion to reconstitute the Initial Creditors' Committee (which had been effectively controlled by the 2002 Noteholders since the filing of the bankruptcy case).  The Bankruptcy Court granted the motion in September 2007, and the U.S. Trustee subsequently appointed a Reconstituted Creditors' Committee.

Morrison & Foerster LLP ("Morrison") substituted in as counsel for VIA in the bankruptcy case, in place of Mr. Kavane and the Pachulski firm.  SBC asserts that Morrison attorney Adam Lewis subsequently refused to give SBC any further access to Mr. Kavane. At the September 6, 2007, Rule 2004 deposition of Mr. Kavane, Mr. Lewis invoked attorney-client privilege to prevent Mr. Kavane from responding to certain questions –

1  particularly those relating to his representation of VIA during the negotiations that led to the

2  VIA Settlement Agreement.

3       On October 31, 2007, SBC filed two motions in the bankruptcy case – a motion for

4  partial relief from the October 31, 2006 order granting approval of the VIA/Intel settlement,

5  and a motion to vacate or modify in part the October 31, 2006 order (collectively, the "Rule

6  60 motions").

7       In the first motion, SBC sought to invalidate the effect of the provision in the VIA

8  Settlement Agreement stating that the VIA Allowed Claim would not be treated as "Senior

9  Indebtedness" under the 2002 Indenture.  SBC asserted that the "waiver" provision had

10 been obtained without any disclosure to the Bankruptcy Court or any consideration being

11 given to the Bankruptcy Estate by the 2002 Noteholders; that the "waiver" provision had

12 been obtained by the Noteholders through abuse of their position on the Creditors'

13 Committee, and "based upon the propagation of a phony story as to the supposed

14 'purpose' of the provisions in the Indenture that granted senior status to VIA vis-à-vis the

15 2002 Noteholders;" and that the "waiver" provision was "void and of no effect."

16      In the second motion, SBC sought to modify or vacate in part the October 31, 2006

17 order approving the VIA Settlement Agreement, "to provide that the undisclosed benefit to

18 [PWSP] and the 2002 Noteholders that asserted claims against [PWSP] ha[d] not been

19 approved by [the Bankruptcy Court]."  SBC asserted that PWSP's conflict with the

20 Noteholders, based on the Noteholders' threat to sue PWSP for indemnification, and

21 PWSP's consequent interest in maximizing the Noteholders' recovery and in avoiding

22 further confrontation with the Noteholders, was inconsistent with PWSP's duties to the

23 SONICBlue Estate to maximize recovery of unsecured creditors generally.

24      SBC indicated, however, that it was not seeking a determination by this motion that

25 VIA's claim was Senior Indebtedness, as it intended that issue to be resolved in the

26 pending adversary proceeding against the 2002 Noteholders.  SBC asserted that all it was

27 seeking was an order "removing" the "purported waiver" (the provision stating that VIA's

28 Allowed Claim would not be considered senior to any other unsecured claim).

United States District Court

For the Northern District of California

1    On January 15, 2008, the 2002 Noteholders brought an adversary proceeding

2 against SBC and VIA, asserting that the VIA Allowed Claim should be subordinated to the

3 Noteholders' claims in the bankruptcy case, and also alleging that by entering into the CTA,

4 VIA and SBC (as VIA's assign) had breached the VIA Settlement Agreement; and that

5 SBC's efforts to rescind the VIA's "waiver" of senior status had improperly interfered with

6 the Settlement Agreement.

7    In February 2008, SBC filed an administrative claim for "$14,000,000+" in the

8 bankruptcy case, asserting that the Bankruptcy Estate had vicarious administrative liability

9 to VIA for the post-petition conduct of its counsel in "defrauding" VIA's former counsel, Mr.

10 Kavane (by representing that the reference in the 2002 Indenture to the $15 million to

11 which the Senior Bonds were subordinated was intended only as a reference to a proposed

12 loan to VIA by SONICBlue that had never occurred).

13    On April 18, 2008, the Chapter 11 Trustee filed an objection to SBC's $14 million

14 administrative claim, and also filed a motion for summary judgment on the objection.  As

15 part of its opposition to the motion (and also to the motions in the adversary proceedings),

16 SBC attempted to establish, through a declaration by counsel, that Mr. Kavane had relied

17 on the representations by SONICBlue's counsel that VIA's claim was not senior to the 2002

18 Noteholders' claims.  However, the moving parties (the Chapter 11 Trustee and the 2002

19 Noteholders) objected that the declaration was hearsay.

20    On May 20, 2008, SBC filed a Rule 56(f) motion to continue the hearing on the

21 Trustee's motion for summary judgment on the objection to SBC's administrative claim,

22 asserting that a continuance was necessary so that SBC could take Mr. Kavane's

23 deposition.  However, this request was eventually abandoned in the course of the

24 settlement of the disputes concerning the Plan of Liquidation.  Nevertheless, SBC

25 asserts that because VIA refused to allow Mr. Kavane to provide the testimony SBC

26 wanted, it (SBC) was compelled to accept a compromise settlement under which the

27 Transferred Rights were valued at less than what SBC's counsel believed they were worth.

28    On June 5, 2008, SBC, the 2002 Noteholders, the Chapter 11 Trustee, and the

United States District Court

For the Northern District of California

1   Reconstituted Creditors' Committee entered into a settlement agreement that was filed with

2   the court that day, providing for a resolution of claims among themselves and the

3   SONICBlue Bankruptcy Estate.  Four days later the Chapter 11 Trustee filed an amended

4   plan and disclosure statement, incorporating the terms of the settlement.  Additional

5   hearings and negotiations followed, resulting in a modified settlement and an amended

6   plan and disclosure statement.  On July 8, 2008, the parties in the SBC adversary

7   proceeding against the 2002 Noteholders filed a stipulation withdrawing their cross-motions

8   for summary judgment.

9        On September 4, 2008, the Chapter 11 Trustee filed the "First Amended Joint

10   Chapter 11 Plan of Liquidation," proposed by the Chapter 11 Trustee and the Reconstituted

11   Creditors' Committee.

12        In the definitions section of the First Amended Plan of Liquidation, "SB Claims" is

13   identified as "SonicBlue Claims LLC, a Delaware limited liability company;" and "SB Claims

14   Holder" is identified as "SB Claims or any successor holder of the VIA Claim as noticed

15   pursuant to Bankruptcy Rule 3001(e)."  "VIA" is identified as "Via Technologies, Inc.;" the

16   "VIA Claim" is identified as the $12,500,000 Unsecured Claim granted to VIA under the VIA

17   Settlement, which Claim is asserted by SB Claims pursuant to a Claims Transfer

18   Agreement dated as of April 24, 2007;" and the "VIA Settlement" is identified as "the

19   settlement agreement between and among SONICBlue, Inc., Intel Corporation, VIA

20   Technologies, Inc., S3 Graphics Co., Ltd., and S3-VIA, Inc." which was approved by the

21   Bankruptcy Court.

22        The First Amended Plan of Liquidation states as follows with regard to the

23   settlement between the 2002 Noteholders and SB Claims.

24        Under the 2002 Notes Indenture, the 2002 Notes are subordinated in right of
     payment to the prior payment of "Senior Indebtedness" as defined in the 2002

25        Notes Indenture.  The Plan Proponents are aware of only one Claim that
     could be entitled to Senior Indebtedness status under the 2002 Notes

26        Indenture, the VIA Claim, granted pursuant to the VIA Settlement.  The VIA
     Settlement contained language which purported to waive any rights VIA might

27        have to assert that the VIA Claim was Senior Indebtedness under the 2002
     Notes Indenture.  SB Claims is the assignee of certain rights to the VIA Claim,

28        and, in that capacity, has filed an adversary proceeding against the 2002

United States District Court

For the Northern District of California

1   Noteholders seeking to classify the VIA Claim as Senior Indebtedness under
2   the 2002 Notes Indenture, a determination that the VIA Claim is Senior
    Indebtedness, or to equitably subordinate the 2002 Notes Claim to the VIA
3   Claim based upon the 2002 Noteholders' alleged conduct in these Chapter 11
    Cases (the "SB Claims Adversary").  The 2002 Noteholders have also
4   initiated an adversary proceeding seeking to equitably subordinate the VIA
    Claim to the 2002 Notes Claims, among other things, based on VIA's alleged
5   breach of the VIA Settlement and SB Claims' alleged tortious interference
    with the VIA Settlement and its alleged conduct in acquiring the VIA Claim
6   (the "2002 Noteholders' Adversary" and together with the SB Claims
    Adversary, the "SB Claims and 2002 Noteholder Litigation").

7       Among other things, the First Amended Plan provided that "[i]n full and complete

8   settlement of the SB Claims and 2002 Noteholder Litigation," SBC would withdraw the SB

9   Claims Adversary and the Rule 60 Motions, with prejudice; the 2002 Noteholders would

10  withdraw the 2002 Noteholders Adversary, with prejudice; and SB Claims Holder would

11  receive a certain percentage of distributions that would otherwise have been paid to the

12  2002 Noteholders, for a total of $7,400,000 to be paid to SB Claims Holder.  In addition, the

13  2002 Noteholders, SBC (including Mr. McGrane and Ferry), and VIA would exchange

14  mutual releases, releasing them from all claims relating to the Chapter 11 Cases, with the

15  exception of claims relating to rights expressly granted to SBC under the First Amended

16  Plan, "and without affecting any rights between VIA and SB Claims under the Claims

17  Transfer Agreement dated as of April 24, 2007."

18      The First Amended Plan noted further that the Chapter 11 Trustee was seeking in

19  another adversary proceeding to equitably subordinate the VIA Claim to the Claims of all

20  other Creditors of the Bankruptcy Estate; and that the Chapter 11 Trustee, the

21  Reconstituted Creditors' Committee, and SBC had determined that it was "appropriate to

22  compromise and settle these disputes, as well as other disputes set forth in th[e] First

23  Amended Plan."  Accordingly, under the compromise and settlement, the parties agreed, as

24  of the effective date of the First Amended Plan, that SBC would withdraw with prejudice the

25  $14,000,000 Administrative Expense Claim; the Chapter 11 Trustee would file a dismissal,

26  with prejudice, of the Trustee/SB Claims/VIA adversary proceeding; and SBC would

27  withdraw its Rule 60 motions, with prejudice.

28      Additionally, the VIA Claim, initially allowed by operation of the VIA Settlement, and

United States District Court
For the Northern District of California

1   later disputed by the filing of "the 2002 Noteholders Adversary and the Trustee/SB

2   Claims/VIA Adversary," would be allowed pursuant to the terms of the First Amended Plan,

3   and would be treated in Class 4 (General Unsecured) and entitled to receive distribution as

4   a Class 4 Allowed Claim.

5        On October 10, 2008, VIA/S3 filed a "Statement of Position" with the Bankruptcy

6   Court, stating that neither the Plan nor its confirmation would alter the rights and

7   obligations of VIA and SBC under the CTA – adding, that "the introduction of the notion of

8   assignment of the VIA Claim by SBC to an assignee, whether a stranger or an affiliate, as

9   reflected by the Plan's defined term 'SB Claims Holder,' shall not alter or amend SBC's

10  obligations under the CTA."  On October 14, 2008, SBC filed a response to VIA/S3's

11  Statement of Position" in which it stated that "the CTA specifically contemplates any

12  assignment of the Transferred Rights which [SBC] might otherwise choose to make, on any

13  terms [SBC] might choose to accept, and that it was in order to facilitate any later

14  assignment that . . . 'the notion of assignability' . . . was inserted into the Plan at [SBC's]

15  specific insistence."

16       Following an October 21, 2008 hearing, the Bankruptcy Court entered an order on

17  October 24, 2008, confirming the First Amended Plan of Liquidation (as modified as of

18  August 22, 2008).

19       On November 5, 2008, SBC transferred to Ferry all of its "right, title, and interest" in

20  the "'VIA Claim,' including, but not limited to," all of SBC's rights "to certain additional

21  payments from the '2002 Noteholders' on account of its present status as 'SB Claims

22  Holder,'" as those terms were defined in the First Amended Plan, confirmed on October 24,

23  2008.  Immediately after this transfer, also on November 5, 2008, Ferry assigned the

24  Transferred Rights to Freefall (a limited liability company formed two days previously), in

25  exchange for $500,000 and a promissory note for $12 million.  Notices of these two

26  transfers were filed with the Bankruptcy Court on November 6, 2008, in accordance with

27  Bankruptcy Rule 3001(e), and also in accordance with the Plan.

28       On November 19, 2008, the Chapter 11 Trustee filed a "Notice of Amounts of

United States District Court
For the Northern District of California

1  Intended Initial Distribution under the First Amended Joint Chapter 11 Plan of Liquidation,"

2  which set forth distribution schedules showing anticipated initial distributions on a creditor-

3  by-creditor basis.  The trustee also requested that the Bankruptcy Court enter an order

4  ("Plan Distribution Order") authorizing the subsequent distribution of more than $74 million

5  in SONICBlue Bankruptcy Estate funds to creditors in accordance with the schedules

6  attached to the notice.

7      Exhibit A to the distribution schedule, under "Class 4 Claims Payee Information,"

8  included columns for "Original Creditor Name" and "Payee Information."  The "original

9  creditor name" for the Allowed VIA Claim was listed as "VIA Technologies, Inc., a

10  Taiwanese Corp & S3 Graphics (2);" and the payee was listed as "Freefall Claims I, LLC,"

11  located at "William C. Lewis Law Offices, 510 Waverly Street, Palo Alto, CA."  Thus, SBC

12  asserts, based on the previously filed transfers of the VIA claim from SBC to Ferry, and

13  then from Ferry to Freefall, the trustee would make all Plan distributions on account of the

14  VIA Claim (approximately $12 million) to Freefall.  VIA filed no objection with the

15  Bankruptcy Court.

16      On November 26, 2008, the Chapter 11 Trustee filed an "Amended Notice of

17  Amounts of Intended Initial Distribution under the First Amended Joint Chapter 11 Plan of

18  Liquidation," renewing his request that the Bankruptcy Court approve the distribution plan.

19  The Amended Notice described certain changes to addresses of payees, and to amounts

20  to be distributed to creditors.  Again, Exhibit A listed VIA as the original creditor, and

21  Freefall as the payee, and again, VIA filed no objection with the Bankruptcy Court.

22      On December 1, 2008, the Bankruptcy Court entered the Plan Distribution Order,

23  which approved the "disbursement of those funds to creditors in accordance with the

24  schedules."  SBC and Freefall/Ferry assert that in so doing, the Bankruptcy Court

25  authorized and approved the Chapter 11 trustee's proposed payment to Freefall (and not

26  SBC) in accordance with the Plan.

27      On December 4, 2008, approximately $12 million was paid to Freefall in accordance

28  with the October 24, 2008 Plan Confirmation Order and the December 1, 2008 Plan

United States District Court

For the Northern District of California

1    Distribution Order.[3]

2        On December 12, 2008, VIA's counsel wrote to SBC, acknowledging that VIA had

3    received the November 26, 2008 trustee's notice, and also stating that "[w]e understand

4    that the trustee has now made initial distributions under the Plan in accordance with the

5    Notice," and asserting that "SBC has, therefore, received an initial $12,007,027 on account

6    of the Transferred Rights."  VIA demanded that SBC itemize all recoverable costs, and

7    stated that it would be providing SBC with a similar itemization, whereupon, VIA anticipated

8    that the parties would be determining the proper allocation of the $8+ million by which the

9    Initial Distribution Amount exceeded the Break Even Amount.

10        On December 17, 2008, SBC's then-counsel William Norman wrote VIA's counsel to

11   say that "as was expressly provided by the now confirmed Plan . . . , SB Claims transferred

12   its ownership interest in the VIA Claim to its majority owner, Ferry Claims LLC, as an in-

13   kind distribution at a time before any cash had every been distributed to anyone on account

14   of the VIA claim," and that the $12 million had not been paid either to SBC or Ferry, but to

15   "an unrelated third party entity named Freefall Claims I, LLC."

16        SBC's counsel also advised VIA's counsel that SBC was considering suing VIA for

17   its failure to cooperate under the CTA, based on VIA's "refus[al] to cooperate in discovery

18   by allowing SB Claims access to critical witnesses based on an inappropriate claim of

19   privilege," which SBC asserted "significantly contributed to SB Claims' need to accept a

20   much lower settlement than it would otherwise have deemed appropriate."

21        On December 23, 2008, VIA's counsel wrote to SBC's counsel to say that VIA/S3

22   Graphics "disagree with virtually everything of substance in your letter" and "will, therefore,

23   be considering their options."  On May 14, 2009, VIA filed the present action against SBC,

24   Ferry, and Freefall, asserting claims of breach of contract and promissory fraud against

25

26        [3]  It is not clear from the papers filed in connection with the present motions, but it
27   appears from the bankruptcy record that this $12 million consisted of $5 million (a pro rata
     share of the VIA claim) plus approximately $7 million that the 2002 Noteholders agreed to pay
28   to SBC pursuant to the parties' settlement of the litigation between them (defined in the First
     Amended Chapter 11 Plan of Liquidation as the "SB Claims Special Distribution").

United States District Court

For the Northern District of California

1   SBC, and claims of fraudulent transfer against Ferry/Freefall.

2          To date, VIA has received nothing pursuant to the CTA, beyond the initial $4 million

3   consideration.  SBC's position is that because it never received "cash" for the VIA claim

4   (having transferred the claim for no consideration to Ferry on November 5, 2008, as an in-

5   kind distribution), VIA never became entitled to receive additional payment.

6          SBC moved to dismiss the breach of contract claim for failure to state a claim, and

7   the motion was granted on September 23, 2009, with leave to amend to allege a claim of

8   breach of the implied covenant of good faith and fair dealing.  VIA filed the first amended

9   complaint ("FAC") on October 23, 2009, alleging claims of breach of contract, breach of the

10  implied covenant, and promissory fraud against SBC; claims of fraudulent transfer against

11  Ferry/Freefall, and a claim for declaratory relief, against all defendants.  Ferry and Freefall

12  answered the FAC on November 2, 2009.

13         On December 23, 2009, the court granted SBC's motion to dismiss the breach of

14  contract claim with prejudice, but denied the motion as to the claim for breach of the

15  implied covenant, on the basis that the issue raised by the motion was not appropriate for

16  decision on a motion under Federal Rule of Civil Procedure 12(b)(6).  On January 5, 2010,

17  SBC filed an answer to the FAC, and also filed a counterclaim against VIA, asserting a

18  claim for breach of contract and a claim for breach of the implied covenant.  Since then,

19  SBC has twice amended the counterclaim.

20         SBC and Ferry/Freefall now seek summary judgment as to the claims alleged

21  against them in the FAC.  VIA seeks an order dismissing the second amended

22  counterclaim.

23                                    **DISCUSSION**

24  A.    Defendants' Motions for Summary Judgment

25         SBC seeks summary adjudication of the second cause of action for breach of the

26  implied covenant, and the ninth cause of action for promissory fraud.  Ferry/Freefall seek

27  summary adjudication of the third through eighth causes of action for fraudulent transfer.  In

28  addition, SBC filed a notice of joinder in Ferry/Freefall's motion, and Ferry/Freefall filed a

**United States District Court**

For the Northern District of California

1 notice of joinder in SBC's motion.

2      1.      Legal Standard

3      Summary judgment is appropriate when there is no genuine issue as to material

4 facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

5 Material facts are those that might affect the outcome of the case.  Anderson v. Liberty

6 Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there

7 is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

8      A party seeking summary judgment bears the initial burden of informing the court of

9 the basis for its motion, and of identifying those portions of the pleadings and discovery

10 responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

11 v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof

12 at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other

13 than for the moving party.  Soremekun v.Thrifty Payless, Inc., 509 F.3d 978, 994 (9th Cir.

14 2007).

15      On an issue where the nonmoving party will bear the burden of proof at trial, the

16 moving party can prevail merely by pointing out to the district court that there is an absence

17 of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 324-25.  If the

18 moving party meets its initial burden, the opposing party must then set forth specific facts

19 showing that there is some genuine issue for trial in order to defeat the motion.  See Fed.

20 R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

21      2.      SBC's Motion

22           a.      Breach of the implied covenant

23      In the FAC, VIA alleges that in transferring the Transferred Rights to Ferry for no

24 consideration, thereby denying VIA of any recovery beyond the initial $4 million, SBC

25 breached the implied covenant of good faith and fair dealing.  SBC argues that summary

26 judgment should be granted as to this claim because it is barred by the doctrine of law of

27 the case, by the express terms of the CTA, and by res judicata arising out of the

28 SONICBlue bankruptcy case.

United States District Court

For the Northern District of California

1    First, SBC asserts that the second cause of action is barred by the doctrine of law

2    of the case.  As the court understands it, SBC's argument is that because the court

3    previously ruled that neither VIA nor SBC breached the express terms of the CTA, and

4    previously ruled that SBC cannot sue VIA for bad faith based on the proper assertion of

5    privilege, the court should also find that VIA cannot sue SBC for bad faith for exercising its

6    right to transfer the VIA claim to Ferry for no consideration.

7    Second, SBC contends that the second cause of action is barred by the express

8    terms of the CTA.  SBC asserts that it is undisputed that SBC never received any "cash"

9    distribution in the SONICBlue bankruptcy case, and that under CTA ¶ 3, SBC's obligation

10   to pay VIA would arise only upon SBC's receipt of "cash."  SBC also argues that it

11   exercised its right under CTA ¶ 8 to settle up the Transferred Rights, by providing, as part

12   of a settlement incorporated into the Plan of Liquidation, that distributions on account of the

13   VIA Allowed Claim would be paid to "SB Claims Holder" (defined by the Plan as meaning

14   "SB Claims or any successor holder of the VIA Claim").

15   SBC notes that under CTA ¶ 20, VIA/S3 "waive[d] any objection to the transfer of the

16   Transferred Rights," and that VIA is precluded from challenging the transfer.  In addition,

17   SBC asserts, VIA's failure to challenge the October 24, 2008 order confirming the Plan

18   constituted a recognition of SBC's authority to transfer the Transferred Rights to any other

19   party on its own terms.

20   Third, SBC asserts that the second cause of action is barred by res judicata.  SBC

21   contends that a confirmed bankruptcy plan is binding on all parties and all questions that

22   could have been raised pertaining to the plan are entitled to res judicata effect.  SBC

23   asserts that under the SONICBlue Liquidation Plan, the right to receive distributions on

24   account of the Transferred Rights belonged to the SB Claims Holder (defined as either

25   SBC or "any successor holder of the VIA claims as noticed pursuant to Bankruptcy Rule

26   3001(e)").  SBC contends that these provisions were an integral part of the Plan, and that

27   the October 28, 2008 Confirmation Order must be treated as a final judgment with res

28   judicata effect.

United States District Court

For the Northern District of California

1    The court finds that the motion must be DENIED.  First, although SBC's arguments

2   are not entirely clear, the court does not agree that either the order denying SBC's motion

3   to dismiss VIA's bad faith claim, or the order granting VIA's motion to dismiss the bad faith

4   counterclaim, with leave to amend, can be considered "law of the case" in terms of whether

5   summary judgment can be granted as to this claim.

6    Second, the court has also already rejected SBC's argument that the claim of breach

7   of the implied covenant is barred by the express language of the CTA.  The court is not

8   now inclined to grant the motion on the same basis previously argued by SBC, particularly

9   given that discovery has not closed.

10    Third, VIA's claims are not barred by res judicata.  SBC's position appears to be that

11   the Bankruptcy Court would have had jurisdiction if VIA had attempted to bring this claim

12   there, and that VIA's failure to do so means that the claim is now barred.  In opposition, VIA

13   argues that SBC has failed to establish the elements required to show res judicata.

14    Claim preclusion bars a claim in a second suit when there is a judgment on the

15   merits on the same cause of action in a first suit between the parties or their privies.

16   Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 326 n.5 (1979); Alaska Sport Fishing

17   Ass'n v. Exxon Corp., 34 F.3d 769, 773 (9th Cir. 1994).  Claim preclusion requires both an

18   identity of claims between the two suits and a final judgment on the merits of the claim in

19   the first suit.  Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,

20   322 F.3d 1064, 1077 (9th Cir. 2003).

21    An identity of claims exists when a party brings a claim on the same cause of action

22   asserted in a previous suit. Id. at 1077-78.  In determining whether a claim asserts the

23   same cause of action, the court should consider whether the second suit would impair or

24   destroy rights established by the first judgment; whether the two suits involve infringement

25   of the same right; whether the same evidence would be presented in the second action;

26   and whether the two suits "arise from the same transactional nucleus of facts." Constantini

27   v. Trans World Airlines, 681 F.2d 1199, 1201-02 (9th Cir. 1982), quoted in United States v.

28   Liquidators of European Fed. Credit Bank, 630 F.3d 1139, 1150 (9th Cir. 2011).

United States District Court

For the Northern District of California

1    The Ninth Circuit has emphasized, however, that these factors are "tools of analysis,

2  not requirements," and the doctrine of res judicata may be applied solely on the ground that

3  the two claims arise out of the same transaction.  International Union of Operating Eng'rs

4  Tr. Funds v. Karr, 994 F.2d 1426, 1430 (9th Cir. 1993); see also Central Delta Water

5  Agency v. United States, 306 F.3d 938, 952 (9th Cir. 2002) (whether two suits arise out of

6  same transactional nucleus of facts is most important factor).

7    The court cannot say that there is an identity of claims between VIA's claim here and

8  any claim brought in the Bankruptcy Court.  Here, the "causes" of VIA's action are

9  defendants' conduct that allegedly deprived VIA of the benefit of its bargain under the CTA,

10  including the right to a portion of the recovery on the Transferred Rights.  These causes of

11  action were not addressed by confirmation of the Plan.  Further, VIA's claims cannot impair

12  any right established by the Plan, because the Plan did not authorize defendants to

13  completely avoid VIA's interest in the bankruptcy, and it explicitly provided that "[n]othing in

14  this First Amended Plan is intended to alter or amend the rights" of SBC and VIA, "inter se,"

15  under the CTA.

16    Nor does VIA's suit involve infringement of the same right, as SBC's alleged

17  infringement of VIA's rights had not even occurred at the time of Plan confirmation.  It was

18  more than a week after the Bankruptcy Court confirmed the Plan on October 28, 2008 that

19  SBC assigned its rights to Ferry for no consideration, and not until December 17, 2008 that

20  SBC asserted that assignment as a basis for paying VIA nothing beyond the initial $4

21  million.  Moreover, because SBC had not yet assigned the Transferred Rights when the

22  Plan was confirmed, there was no question of any breach of the CTA at that time.

23    Finally, VIA's claims are arguably based on a different "transactional nucleus of

24  facts," as the bankruptcy proceeding arose from transactions and obligations between

25  creditors and debtors, while VIA's claims arise from its separate transaction with SBC.

26  Moreover, SBC has identified no final judgment on the merits regarding a prior claim by VIA

27  against SBC that can be said to have resolved VIA's current causes of action on the merits.

28  Thus, the Bankruptcy Court's confirmation of the Plan does not constitute a preclusive

1    "judgment" as to the claims raised by VIA in this action.

2         SBC's "supplemental" brief (incorporating the "supplemental" brief of Ferry/Frefall)

3    which was not authorized, and argument in its "omnibus" reply, does not change this result.

4    The case cited by SBC, Ta Chong Bank, Ltd. v. Hitachi High Techs. America, Inc., 610

5    F.3d 1063 (9th Cir. 2010), involved an action brought by the plaintiff bank, seeking recovery

6    under the bank's interest in accounts receivable of a third party, pursuant to certain

7    factoring agreements entered into by that party.  This court dismissed the bank's claims,

8    because the third party had filed for bankruptcy protection, and the Bankruptcy Court had

9    determined that the third party's accounts receivable were the property of the bankruptcy

10   estate.  The Ninth Circuit agreed, finding that the bank did not possess any claim separate

11   and distinct from those that were adjudicated in the bankruptcy proceeding.  Id. at 1068.

12        Here, as explained above, VIA alleges that defendants breached the implied

13   covenant of good faith and fair dealing by preventing VIA's recovery under the CTA.  Since

14   the events of which VIA complains had not yet occurred as of the time the Plan of

15   Liquidation was confirmed, the claim could not have been asserted in the bankruptcy

16   proceeding.  Moreover, in Ta Chong, an adversary proceeding had addressed and resolved

17   the same claim that the bank later asserted in state court (which claim was removed to the

18   federal district court), whereas in this case, there was no adversary proceeding regarding

19   the CTA.

20        In addition, as of the time of the October 2008 Confirmation Order, VIA was

21   technically no longer a creditor of SONICBlue with respect to the Transferred Rights, as it

22   had assigned all right to the Transferred Claims to SBC.  Thus, it is not clear that VIA was

23   required to bring the present claims before the Bankruptcy Court, as SBC seems to be

24   arguing.

25             b.    Promissory fraud

26        SBC also seeks summary judgment as to the ninth cause of action for promissory

27   fraud.  "Promissory fraud is a subspecies of fraud and deceit.  A promise to do something

28   necessarily implies the intention to perform; hence, where a promise is made without such

United States District Court

For the Northern District of California

1 | intention, there is an implied misrepresentation of fact that may be actionable fraud." Lazar

2 | v. Superior Court, 12 Cal. 4th 631, 638 (1996).  To establish a claim of promissory fraud, a

3 | plaintiff must satisfy the same elements as he would if asserting a general fraud claim.  See

4 | Engalla v. Permanente Medical Group, Inc., 15 Cal. 4th 951, 974 (1997) (elements of

5 | promissory fraud are misrepresentation, knowledge of falsity, intent to induce reliance,

6 | justifiable reliance, and resulting damage).

7 |      SBC asserts that the promissory fraud claim is "frivolous," as Robert Imhoff and

8 | Michael Singer – the individual principals of SBC as of April 2007 – deny VIA's suggestion

9 | that SBC secretly never intended to pay VIA any "Excess Cash."  In declarations submitted

10 | by SBC, both Mr. Imhoff and Mr. Singer deny having harbored an intention to cheat VIA out

11 | of the "Excess Cash."  SBC argues that because VIA has presented no additional evidence

12 | of promissory fraud, summary judgment should be granted as to this claim.

13 |      SBC also argues that it is undisputed that it continued to perform under the CTA for

14 | a lengthy period following its execution, and that VIA can offer no evidence that it was

15 | misled about the fact of the transfer of the VIA claim, or concerning SBC's always firm

16 | position that it was not thereafter required to provide any further payment to VIA.

17 |      In opposition, VIA asserts that the promissory fraud claim cannot be dismissed for

18 | "failure of proof" because no discovery has been conducted (other than exchange of initial

19 | disclosures).  VIA also argues that SBC has failed to meet its burden of identifying the

20 | evidence that it believes demonstrates the absence of a genuine issue of material fact.

21 |      In addition, VIA argues, discovery is likely to elicit specific evidence that will preclude

22 | summary judgment.  For example, VIA asserts that discovery will show that SBC intended

23 | VIA to rely on its promise to pay VIA whatever was recovered in the Bankruptcy case

24 | above the $4 million initial payment, and will also show that SBC lacked justification for

25 | transferring the Transferred Rights to Ferry, other than to avoid making good on its promise

26 | to VIA.

27 |      The court finds that the motion must be DENIED.  Having had no opportunity to

28 | engage in discovery, VIA cannot be expected to provide facts to oppose the evidence

1   submitted by SBC regarding the claim for promissory fraud.

2        2.    Ferry/Freefall's Motion

3        Ferry/Freefall argue that summary judgment should be granted as to the third

4   through eighth causes of action for fraudulent transfer.  They assert that because VIA failed

5   to object to, appeal from, or seek reconsideration of either the Plan Confirmation Order or

6   the Plan Distribution Order, it is now barred by principles of res judicata from asserting that

7   there was anything improper about the transfers that led to the $12 million payment to

8   Freefall.

9        VIA makes essentially the same arguments in opposition to Ferry/Freefall's motion

10  as it made in opposition to SBC's motion.

11       The court finds that the motion must be DENIED.  The claims against Ferry/Freefall

12  are not barred by res judicata, for the reasons stated above with regard to SBC.

13  B.   Motion to Dismiss the Second Amended Counterclaim

14       1.    Legal Standard

15       A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims

16  alleged in the complaint.  Ileto v. Glock, Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003).

17  Review is limited to the contents of the complaint.  Allarcom Pay Television, Ltd. v. Gen.

18  Instrument Corp., 69 F.3d 381, 385 (9th Cir. 1995).  To survive a motion to dismiss for

19  failure to state a claim, a complaint generally must satisfy only the minimal notice pleading

20  requirements of Federal Rule of Civil Procedure 8.

21       Rule 8 requires only that the complaint include a "short and plain statement of the

22  claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Specific facts

23  are unnecessary – the statement need only give the defendant "fair notice of the claim and

24  the grounds upon which it rests."  Erickson v. Pardus, 551 U.S. 89, 93 (citing Bell Atlantic

25  Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  All allegations of material fact are taken as

26  true.  Id. at 94.  However, a plaintiff's obligation to provide the grounds of his entitlement to

27  relief "requires more than labels and conclusions, and a formulaic recitation of the elements

28  of a cause of action will not do."  Twombly, 550 U.S. at 555 (citations and quotations

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief

2  above the speculative level."  Id.

3       A motion to dismiss should be granted if the complaint does not proffer enough facts

4  to state a claim for relief that is plausible on its face.  See id. at 558-59.  "[W]here the

5  well-pleaded facts do not permit the court to infer more than the mere possibility of

6  misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is

7  entitled to relief.'"  Ashcroft v. Iqbal, 556 U.S. __, 129 S.Ct. 1937, 1950 (2009).

8       In addition, when resolving a motion to dismiss for failure to state a claim, the court

9  may not generally consider materials outside the pleadings.  Lee v. City of Los Angeles,

10  250 F.3d 668, 688 (9th Cir. 2001).  There are several exceptions to this rule.  The court

11  may consider a matter that is properly the subject of judicial notice, such as matters of

12  public record.  Id. at 689; see also Mack v. South Bay Beer Distributors, Inc., 798 F.2d

13  1279, 1282 (9th Cir. 1986) (on a motion to dismiss, a court may properly look beyond the

14  complaint to matters of public record and doing so does not convert a Rule 12(b)(6) motion

15  to one for summary judgment).  Additionally, the court may consider exhibits attached to

16  the complaint, see Hal Roach Studios, Inc. V. Richard Feiner & Co., Inc., 896 F.2d 1542,

17  1555 n.19 (9th Cir. 1989), and documents referenced by the complaint and accepted by all

18  parties as authentic, see Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th

19  Cir. 2002).

20       2.    VIA's Motion

21       VIA seeks an order dismissing both claims asserted in the second amended

22  counterclaim ("SACC").

23       In the first amended counterclaim ("FACC"), SBC alleged claims of breach of

24  contract, breach of the implied covenant of good faith and fair dealing, and declaratory

25  relief.  SBC contended that one of the purposes of the CTA was to allow SBC to "maximize

26  the value" of the Transferred Rights by obtaining a resolution of the dispute concerning the

27  Senior Indebtedness, and alleged that the parties' reasonable expectations were therefore

28  that VIA would "affirmatively cooperate" with SBC's efforts in that regard, and would do

nothing to "hinder" SBC's efforts.

However, SBC alleged, VIA "hindered" those efforts by hiring the Morrison firm to represent VIA in the bankruptcy case, and by allowing Morrison to advise that it could assert attorney-client privilege and work product protection with regard to the proposed Kavane testimony.  SBC described the Morrison firm as "conflicted," based on its duties of confidentiality toward VIA, and its separate duty to PWSP.  This duty to PWSP allegedly arose out of Morrison's and PWSP's ownership interest in MPC Insurance Ltd., a self-funded malpractice insurer; as well as from an alleged agreement among all MPC insureds never to sue a fellow-MPC insured.  SBC asserted that these conflicts made it impossible for Morrison to give VIA unbiased advice regarding whether VIA acting through Mr. Kavane had made a waiver of attorney-client privilege.

SBC asserted that in "hindering" SBC's efforts to "prosecute the Senior Debt Fraud" by refusing to waive attorney-client privilege and work-product protection, VIA breached ¶¶ 8, 13, and 15 of the CTA.  SBC also alleged that these same actions constituted breach of the implied covenant of good faith and fair dealing, in that VIA improperly asserted attorney-client privilege when SBC sought to obtain statements from Mr. Kavane, thereby "failing to cooperate" with SBC's attempt to resolve the Senior Indebtedness dispute. According to SBC, had VIA not violated the implied covenant, the Transferred Rights would have had a value of not less than $22.5 million, as opposed to a mere $12.5 million. Therefore, SBC asserted, it had been damaged in an amount not less than $10 million.

SBC also sought a judicial declaration as to whether it had breached the implied covenant when it transferred the VIA Claim to its parent entity Ferry as an in-kind distribution; and a judicial declaration as to whether VIA had breached the implied covenant as alleged by SBC in its second claim.

VIA moved to dismiss the FACC, and the court granted the motion as to the claim for breach of contract and the claim for breach of the implied covenant, and granted it in part and denied it in part as to the claim for declaratory relief.  In dismissing the bad faith claim, the court found that it was "based on the same faulty premise as the claim for breach

United States District Court
For the Northern District of California

of contract – that VIA was required to waive attorney-client privilege." The court added that because "there was nothing unlawful about VIA's assertion of the privilege, SBC cannot state a claim for breach of the implied covenant based on VIA's refusal to waive the privilege."

In response to SBC's motion for leave to amend the counterclaim, in which SBC complained that it was not fair for the court to deny SBC's motion to dismiss VIA's bad faith claim, while at the same time granting VIA's motion to dismiss SBC's bad faith claim, and also requested leave to file "an amended counterclaim which radically changes the counterclaim which the court has previously rejected," the court issued a second order clarifying that SBC would be permitted leave to amend the bad faith claim.

In the SACC, SBC alleges a claim of breach of the implied covenant of good faith and fair dealing, and a claim for declaratory relief. Notwithstanding SBC's prior assertion that the proposed SACC "radically changes the counterclaim which the court has rejected," the court finds that the allegations in the SACC are substantially similar to those in the FACC.

As in the FACC, SBC alleges that the Morrison firm was conflicted at the time it began representing VIA because of its relationship with PWSP. SBC also asserts that Mr. Lewis' assertion of the attorney-client privilege, on behalf of VIA against SBC respecting Mr. Kavane (both in deposition and in a court hearing) constituted a failure to "reasonably cooperate" with SBC.

SBC asserts further that VIA's assertion of the attorney-client privilege respecting Mr. Kavane, after Mr. Kavane had allegedly waived the privilege by discussing the issues with SBC's counsel, was "frivolous," and was therefore contrary to the CTA's purposes and the parties' legitimate expectations, and constituted a breach of the implied covenant. In addition, SBC claims that VIA's assertion of the privilege was unlawful because it violated California Business & Professions Code § 6106 (forbidding any member of the State Bar from acting dishonestly toward any person), thereby subjecting VIA to vicarious liability to SBC for breach of the implied covenant.

United States District Court

For the Northern District of California

1   SBC also seeks a declaratory judgment as to both the question whether SBC

2   breached the implied covenant, and the question whether VIA breached the implied

3   covenant.

4   In the present motion, VIA seeks an order dismissing the claim for breach of the

5   implied covenant, and also dismissing the claim for declaratory relief, as duplicative of the

6   bad faith claim.

7   VIA argues that the claim for breach of the implied covenant should be dismissed,

8   for four reasons – because the court has already considered and rejected SBC's

9   allegations; because VIA's election to assert privilege cannot violate the implied covenant

10  as a matter of law; because SBC has pleaded no facts from which it could be inferred that

11  VIA's assertion of the privilege was "frivolous;" and because SBC cannot show damages.

12  First, VIA contends that the court has already considered and rejected SBC's

13  allegation that VIA voluntarily waived the privilege before asserting it.  VIA asserts that SBC

14  identified this "voluntary waiver" in its opposition to the motion to dismiss the FACC as one

15  of the "real issues in the case," and repeatedly argued that VIA's counsel had asserted the

16  privilege in bad faith, and that the assertion of privilege was influenced by VIA's purportedly

17  conflicted counsel.

18  VIA also notes that the court previously found that VIA had no duty to cooperate with

19  SBC by waiving the attorney-client privilege.  VIA argues that because the SACC adds

20  nothing more for the court to consider, the new pleading is nothing more than an improper

21  request for reconsideration, and that the court should dismiss the claim without leave to

22  amend.

23  In opposition, SBC asserts that the bad faith consists of VIA's acting, post-Closing,

24  in a way that was contrary both to the CTA's purpose – which it asserts was "maximization

25  of the value of the Transferred Rights" – and to "the parties' legitimate expectations" –

26  which it claims was that VIA would cooperate with SBC in that maximization effort to help

27  SBC get to the Break Even Amount.

28  In its second main argument, VIA asserts that its election to assert privilege cannot

29

United States District Court

For the Northern District of California

1   be held to violate the implied covenant as a matter of law.  VIA notes that this court

2   previously rejected the theory that a "cooperation" clause in an agreement operates as a

3   contractual waiver of attorney-client privilege.  Further, VIA asserts, the CTA does not

4   contain a specific "cooperation" clause.  Rather, it states that VIA provided the "Transferred

5   Rights" to SBC "as is" and "without warranty or representation," and also that VIA might

6   have "non-public information about the Allowed Claim and the Debtor that has not been

7   provided to SBC," and that "SBC has adequate information . . . to make an informed

8   decision regarding the sale/purchase of the Transferred Rights."  CTA ¶ 10.  In addition, the

9   CTA described VIA's limited obligation in assisting SBC as an obligation to "execute,

10   deliver, and file . . . such further documents and instruments as may be necessary" to effect

11   the purposes of the agreement.  Id. ¶ 15.

12         In response, SBC argues that the mere fact that VIA's assertion of its attorney-client

13   privilege may not have been unlawful (though SBC claims it was) does not confer immunity

14   on VIA from bad faith liability on account of VIA's assertion of the privilege.  SBC contends

15   that under Carma Developers (Cal.), Inc. v. Marathon Development Cal., Inc., 2 Cal. 4th

16   342 (1992), anything not expressly allowed by a contract (such as VIA's assertion of the

17   privilege) may be the subject of a proper bad faith claim if it is "contrary to the contract's

18   purposes and the parties' legitimate expectations."

19         In its third main argument, VIA asserts that SBC has pleaded no facts to support its

20   claim that VIA's assertion of privilege was "frivolous," and that in any event, this claim is

21   without merit.  VIA contends that the CTA included no implied duty to provide SBC with any

22   information about Transferred Rights; and that SBC has pointed to no language in the CTA

23   or any other document that supports its interpretation or suggests that VIA would at some

24   point provide SBC with "non-public information" about the Allowed Claim and the Debtor,

25   which the CTA expressly stated that SBC acknowledged had not been provided.

26         VIA also argues that SBC alleges no facts supporting an alleged privilege waiver.

27   VIA contends that the fact that SBC's attorneys discussed a "highly detailed" complaint

28   against the Noteholders with Mr. Kavane does not mean that anything that Mr. Kavane may

United States District Court

For the Northern District of California

1  have said constituted a waiver of attorney-client privilege.  Moreover, VIA asserts, having

2  now based its SACC on a claim of waiver, it is SBC's burden to identify the particular

3  privileged communication that it contends that Mr. Kavane (as VIA's counsel) revealed.

4      VIA notes that the only "disclosure" alleged is that Mr. Kavane stated to Mr.

5  McGrane and Mr. Shaffer that the allegations in SBC's already-filed adversary proceeding

6  were accurate to the best of his knowledge.  VIA argues that this was not sufficient to waive

7  VIA's attorney-client privilege, because waiver would have required VIA to voluntarily

8  disclose a substantial part of the privileged communication or to otherwise unambiguously

9  manifest disclosure by others.  VIA argues that SBC fails to explain how Mr. Kavane's

10  confirmation of some of SBC's allegations was a "substantial disclosure" of confidential

11  communications.

12      Finally, VIA contends that its assertion of the privilege could not have been

13  "frivolous" or "unlawful," in view of the fact that SBC elected not to challenge it in the

14  Bankruptcy Court.  VIA contends that it is not frivolous or unlawful to continue to assert a

15  privilege in response to an adversary's mere assertion that the privilege has been waived,

16  and also that ethical rules in fact require it.

17      VIA asserts further that its assertion of the privilege cannot be "frivolous" as a matter

18  of law, where the basic requirement of privilege under California Evidence Code § 954 –

19  that it be a confidential lawyer-client communication – is arguably present.  In that situation,

20  VIA contends, the party asserting the privilege bears no burden regarding whether waiver

21  occurred.  VIA argues that even if SBC had sought to compel VIA to provide the information

22  it sought (which it did not), VIA would have had no burden to establish that it did not waive

23  the privilege.  VIA contends that SBC's counterclaim improperly places the burden of

24  demonstrating that the privilege did not apply onto VIA.

25      Moreover, VIA argues, under California Evidence Code § 955, attorneys have a duty

26  to assert the privilege absent an instruction from the client not to do so.  VIA contends that

27  pursuant to this duty, any responsible attorney asked by a third party not to waive the

28  privilege would presume that the privilege had not been waived unless a court held

United States District Court

For the Northern District of California

1   otherwise.

2          In opposition, with regard to VIA's argument that the CTA created no duty to provide

3   SBC with any information about the Transferred Rights, privileged or otherwise, SBC

4   asserts that the provision in the CTA that VIA may have "non-public information . . . that

5   has not been provided," CTA ¶ 10, cannot be interpreted as suggesting that VIA had no

6   duty to "cooperate" with SBC when it came to maximizing the value of the Transferred

7   Rights.

8          With regard to VIA's argument that SBC has alleged no facts supporting a privilege

9   waiver, SBC responds that the SACC alleges that once Mr. Kavane had met with SBC's

10  attorneys and had discussed the complaint against the 2002 Noteholders, VIA waived any

11  possible attorney-client privilege that otherwise might have existed between Mr. Kavane

12  and VIA respecting the matters covered by the declaration that SBC sought to obtain from

13  Mr. Kavane to use in the adversary proceeding in the Bankruptcy Court.

14         With regard to VIA's argument that SBC fails to explain how Mr. Kavane's

15  confirmation of some of SBC's allegations constituted a "substantial disclosure" of

16  confidential information, SBC argues that this case involves statements made by Mr.

17  Kavane to SBC's counsel to the effect that Mr. Kavane's client – VIA – had believed and

18  relied on alleged misrepresentations made to him by counsel for the SONICBlue

19  Bankruptcy Estate.  SBC also contends that if what Mr. Kavane said to SBC's attorneys

20  was not privileged, then VIA's subsequent assertion of the privilege was necessarily

21  frivolous.

22         With regard to VIA's claim that SBC has alleged neither disclosure of any privileged

23  information nor any facts showing VIA's consent to such disclosure, SBC contends that it

24  has properly alleged an attorney-client relationship between Mr. Kavane and VIA at the

25  time the waiver actually occurred.

26         With regard to VIA's argument that even if VIA somehow waived the privilege, SBC

27  has pled nothing to suggest that VIA's unchallenged assertion of the privilege was frivolous

28  or in bad faith; and that at the time of contracting, SBC could not have had a reasonable

United States District Court

For the Northern District of California

1  expectation that VIA would provide it with the information in question, SBC contends that

2  this argument is "truly the most ridiculous."

3       In its fourth main argument, VIA contends that the breach of the implied covenant

4  claim must be dismissed because SBC cannot show damages.  VIA contends that at the

5  time that it asserted its privilege (and certainly as of the time of contracting), neither party

6  could have foreseen that merely asserting the attorney-client privilege could result in any

7  material damages.  Indeed, VIA notes, the court has already held that it was never even

8  part of the bargain, implicitly or explicitly, for SBC to have any right to VIA's privileged

9  information.

10      In opposition, SBC asserts that it can and will prove substantial damages against

11 VIA, but that a determination regarding the issue of entitlement to damages is not

12 appropriate for decision on a Rule 12(b)(6) motion.

13      Finally, with regard to the claim for declaratory relief, VIA argues that this claim

14 should be dismissed to the extent that it seeks the same relief as the claim for breach of the

15 implied covenant.  SBC's argument in opposition is not entirely clear, but it appears that

16 SBC concedes that VIA is correct.

17      The court finds that the motion must be GRANTED.  As an initial matter, it is true

18 that the court denied SBC's motion to dismiss VIA's claim for breach of the implied

19 covenant, on the basis that the issue whether SBC's conduct, though not prohibited, was

20 nevertheless contrary to the contract's purposes and the parties' legitimate expectations,

21 was not appropriate for decision on a Rule 12(b)(6) motion.  However, in so ruling, the court

22 did not intend to hold that any time a party asserts a claim for breach of the implied

23 covenant that the court must find that dismissal under Rule 12(b)(6) is not appropriate – as

24 SBC seems to be arguing here.

25      In this case, there are differences between the two claims sufficient to warrant

26 dismissal of SBC's claim for failure to state a claim.  The "Agreement" recited in the CTA

27 governed the transfer of VIA's claims against SONICBlue to SBC, for certain consideration.

28 The issue with regard to VIA's claim is whether SBC's transfer of the claim without

United States District Court

For the Northern District of California

1  consideration to a related entity, after the confirmation of the Plan of Liquidation, in order to

2  avoid having to pay VIA more than the original $4 million, was done in bad faith and was

3  contrary to the expectations of the parties.

4      SBC's claim against VIA is based on an alleged "waiver" of attorney-client and work-

5  product privilege.  SBC argues that the bad faith alleged in the breach of implied covenant

6  claim consists of "VIA's acting, post closing, in a way that was contrary to the CTA's

7  purpose" – which SBC identifies as "maximization of the value of the Transferred Rights –

8  and was also contrary to "the parties' legitimate expectations" – which SBC claims is that

9  VIA "would cooperate with SBC in that maximization effort to help SBC get to [the Break

10  Even] Amount."

11      It is true that the CTA provided that SBC had the right "in its sole and only discretion"

12  to attempt to obtain a "resolution of the Senior Debt Disputes . . . so as to maximize

13  recovery on the Transferred Rights."  However, SBC also accepted the Transferred Rights

14  "as is," and assumed the risk that the Allowed Claim might not be "Senior Indebtedness"

15  under the Indenture.  Moreover, while VIA agreed to execute, deliver, and file any

16  documents necessary to effectuate the purposes, terms, and conditions of CTA, it did not

17  expressly agree to do anything to assist SBC in its effort to "maximize the value" of the

18  Transferred Rights.  In addition, the CTA expressly acknowledged that VIA might have

19  "non-public information about the Allowed Claim and [SONICBlue] that has not been

20  provided to SBC."

21      Notwithstanding all the verbiage, SBC's claim in the SACC is still premised on the

22  assumption that the CTA imposed a duty on VIA not to waive the privilege.  That argument

23  has already been rejected by the court.  Even if there were a provision in the CTA imposing

24  a general duty to "cooperate" (which there is not), a duty to disclose privileged information

25  cannot be implied from such an agreement.  See Rockwell Int'l Corp. v. Superior Court, 26

26  Cal. App. 4th 1255, 1263-66 (1994); Maas v. Municipal Court, 175 Cal. App. 3d 601, 606-

27  07 (1985).

28      SBC's argument that VIA's counsel waived the privilege by orally confirming to SBC

34

United States District Court
For the Northern District of California

1  that the balance of the allegations contained in SBC's complaint in the adversary

2  proceeding were "substantially or materially correct" is without merit, as SBC has not

3  established that Mr. Kavane waived the privilege.

4      The client holds the privilege to prevent disclosure of a confidential communication

5  between the client and the attorney, and only the holder may waive the privilege.  See Cal.

6  Evid. Code §§ 953, 954.  In California, a waiver of the privilege requires a party to

7  voluntarily disclose a "substantial part of the privileged communication or otherwise

8  unambiguously manifest[ ] [its] disclosure by others.  Glade v. Superior Court, 76 Cal. App.

9  3d 738, 744 (1978); see Cal. Evid. Code § 912.  An attorney does not waive privilege

10  simply by verifying the accuracy of a pleading.  See Alpha Beta Co. v. Superior Court, 157

11  Cal. App. 3d 818, 829-31 (1984).  "Attorney-client privilege seeks to protect the

12  conversations and communications between attorney and client, not necessarily the facts

13  developed by those conversations."  Id. at 830.

14      SBC's contention that Mr. Lewis' assertion of the privilege on VIA's behalf was

15  "frivolous" is also without merit.  An attorney has an affirmative duty to claim the privilege if

16  he is present when a privileged communication is sought to be disclosed.  See Cal. Evid.

17  Code § 955; see also Cal. Bus. & Prof. Code § 6068(e)(1) (attorney's duty of

18  confidentiality).  A "communication" within the meaning of the privilege is broadly construed

19  to refer to any means of conveying information between a client and his/her lawyer, or

20  advice given by the lawyer.  See City and County of San Francisco v. Superior Court, 37

21  Cal. 2d 227, 235-36 (1951).

22      As for VIA's argument that the bad faith claim should be dismissed because SBC

23  has failed to allege facts showing that it was damaged by VIA's assertion of the privilege,

24  the court agrees with SBC in principle that the question of entitlement to damages is not

25  appropriate for decision in a Rule 12(b)(6) motion.  The court notes however, that in this

26  case, there is no indication in the record that SBC successfully pursued an order from the

27  Bankruptcy Court compelling Mr. Kavane to testify regarding the VIA Settlement

28  Agreement.  While SBC did file a Rule 56(f) motion with its opposition to the Trustee's

1  motion for summary judgment on the objection to SBC's $14 million administrative claim,

2  that effort, too, was abandoned.  Thus, there is some merit to VIA's argument that even if

3  SBC suffered damages, its own choice not to take any action was the cause of those

4  damages – not VIA's mere assertion of attorney-client privilege (regardless of how

5  "unlawful" or "unreasonable" SBC now claims that assertion was).

6          Finally, it appears to the court that any possible entitlement to a claim that VIA

7  "hindered" or "failed to cooperate with" SBC's efforts to "maximize the value" of the VIA

8  Allowed Claim, by obtaining an order vacating a key provision of the VIA Settlement

9  Agreement, ended with the entry of the order confirming the Plan of Liquidation and the

10 order regarding final distribution.  SBC settled with the 2002 Noteholders and the Creditors'

11 Committee, and obtained a distribution that the Bankruptcy Court found fair and

12 reasonable.  In the absence of some agreement relevant to the attorney-client privilege

13 issue, there is now no basis for SBC to allege that VIA's assertion of the privilege in the

14 bankruptcy case was "contrary to the [CTA's] purposes and the parties' legitimate

15 expectations."

16         The motion as to the claim for declaratory relief is GRANTED.

17                                          **CONCLUSION**

18         In accordance with the foregoing, VIA's motion to dismiss the second amended

19 counterclaim is GRANTED, without leave to amend; SBC's motion for summary judgment

20 is DENIED; and Ferry and Freefall's motion for summary judgment is DENIED.

21

22 **IT IS SO ORDERED.**

23 Dated:  March 23, 2011                    _____

24                                          PHYLLIS J. HAMILTON
                                           United States District Judge
25

26

27

28

United States District Court
For the Northern District of California